By the Court.

Benning, J.
delivering the opinion.
The Court decided that, Beall, the plaintiff, was not bound to answer any of the interrogatories propounded to him, ex *27 cept the first. And the first question is, was that decision right ?
The interrogatories as to which this decision was made, had two objects in view; one, to prove that Beall obtained the bills at a discount — the other, to prove that he had made an agreement with his attorney, Mr. Dougherty, by which, Mr. Dougherty, was to bring suit for the collection of the bills, was to be responsible for the costs of suit, and was to have for pajq one-half, or, one-third, or some other part of the money that might be collected.
We think, that neither of these objects was sufficient to require the interrogatories to be answered.
£l.] There is no law prohibiting the circulation of notes that are under par, whether the notes of corporations, or those of natural persons; and, in practice, notes under par, circulate as other notes.
£2.] Nor is there any law, saying, that one who purchases notes at a discount, shall not collect out of those liable oft the notes, more than he gave for the notes. Of what concern is it to those persons, whether he gave for the notes* much or little, or even gave nothing. Their bargain was to pay all the notes call for, and, to any one who should present the notes.
£S.J Suppose it true, that Beall made a champertous agreement with his attorney, for the collection of the bills, yet did that make the bills themselves void as between Beall and the parties liable on the bills? No one will say so. But unless the bills were thus void, Beall had the right to sue upon them, and to collect them. Now, the suit brought is one which is Beall’s, and which is upon the bills, which tabes no notice whatever, of the existence of the supposed champertous agreement. It is not a suit to enforce that agreement; it is not a suit, the judgment in which, could be used in any way to help out, or ratify, that agreement. It would seem to follow, then, that if the champertous agree *28 ment did not make the bills themselves void, Beall had the right to sue upon them, as he has done in this case.
We think, then, that the Court was right in not requiring the interrogatories to be answered, and was also right, in refusing to permit the answer to the eleventh of them, tc be read.
One of the transfers of stock was “signed by A. B. Ragata, cashier.” A. B. Ragan was the cashier of the bank, at ihv time of this transfer. This transfer was objected to, on the ground, that “ the bank could not transfer stock,” — the meaning of which ground seems to have been, that the bank was forbidden to become the owner of its own stock, and, therefore, could not have had any stock to transfer. The objection was overruled, and the transfer received.
No law was read to us, prohibiting banks from acquiring-title, to their own stock. And we do not know of any such law. And, as to this bank, its charter says, that it shall be, “able and capable in law, to have, purchase, receive, possess, enjoy, and retain,” “ lands, rents, tenements, hereditaments» goods, chattels, and effects, of what kind, nature or quality, whatsoever, and the same to sell, grant, demise, alien, or dispose of.” Pr. Dig. 125. Here is an express grant of power to “purchase” and of power to “sell,” every kind of “goods, chattels, and effects.”
So the third section of the charter declares that “if there shall be a failure in the payment of any sum subscribed for/’ the shares upon which such failure shall happen, shall be forfeited, and they may again be sold, and the proceeds of the sale, together with the sums paid on the shares, shall revert to the benefit of the corpoiation. And see section 15.
[4.] We think, then, that the Court was right in admitting-the transfer.
Two of the transfers to Robison, were signed by H. S. Smith, as attorney — one by him, as attorney for Wm. A. Redd, the other, by him, as attorney for Jno. E. Morgan. These two were objected to, on the ground, that “ there was *29 no evidence of Smith’s being attorney for Redd, or for Morgan.” The Court overruled the objection.
It is no doubt true, that these two transfers were void, unless Smith had authority to make them, or bis making them was ratified by Redd and Morgan. The Court, in' deciding uhat they were admissible, did not decide, that it would not b e necessary, after their admission, to show Smith’s authoriry. And, accordingly, some evidence was offered, going to show Smith’s authority — doing so, it is true, in a very indirect, and perhaps a very slight manner. This evidence was, •;hat Robison made a subsequent transfer of four hundred shares of the stock; and, that, without the shares transferred 'y.r him by Smith, he did not have four hundred shares, to transfer. If Robison transferred the shares which Smith, U.3 agent, had transferred to him, he did what carried within íz. Aprima facie admission, slight, it is true, that Smith had authority to make the transfer to him.
At all events, we do not think, that the Court erred in ad■rudUing the transfers in the first instance; and no motion was made to rule them out, for a failure to prove Smith’s -.authority.
Much of the statement of the witness, Mathew Robertson, which was rejected by the Court, consisted of what was his . opinion, the materialit3r of the rest is not apparent to us,— not that we mean to say, that we think any of the statement to have been material. This it is not necessary to decide. There was no motion for a new trial.
The exceptions relating to the statute of limitations, we passs without deciding.
The thirteenth request to charge, was, that if Robison became a stockholder b3^ transfer from other stockholders afthe failure of the bank, and those stockholders had not been discharged from liability, in terms of the charter, they remained liable, and Robinson was not liable.
This request seems to be founded upon the assumption, -.bat a transfer of stock made after a failure of the bank, *30 would be void, — and therefore, that such a transfer would not make the transferer become a non-stockholder, or the tranferee, a stockholder.
But we do not see any authority for the assumption, that a transfer of stock made after a failure of the bank, would be void. The charter does not seem to know any difference between the right of transfer before a failure of the bank, and the right of transfer afterwards. It merely says, in general terms, that the directors “are authorized to open transfer books, by agents or otherwise, whenever they may deem it advisable.” (14. Sec.)
It is true, that the 16th section says, “that in case of a failure of the said bank, all the stockholders who may have sold their stock at any time within six months prior to said failure, shall be liable in the same manner as if they had not sold their stock.” But this is a provision for a different case, that of a transfer “prior” to a failure of the bank— and the provision, even for that case, is not that the transfer shall he void, but that the stockholder making it, shall remain liable in the same manner as if he had not made it. Indeed, the provision, by speaking of the stock as having been “sold,” itself silently assumes, that the sale, (or transfer,) would be good.
Different was the provision on which, Lumpkin et al vs. Jones, turned. That provision was, “that all transfers of stock in said bank shall be wholly void, if made within six months previous to the failure of the said bank,” &c.
Different too are the provisions on which, the decisions from other States went.
These things being so, and the 11th section of the charter declaring, that “ no stockholder shall be relieved from” his “liability, by sale of his stock, until he shall have caused to have been given, sixty days notice in some public gazette of this State;” and, there not being any evidence, that such a notice was given by Robison, we think, that the Court was right in refusing this 13th request.
*31 The fourteenth request was, to charge, that if Robison had, before the assignment made by the bank and before the forfeiture of its charter, and while it continued to do business and was able to pay its debts, transferred the stock held in his name, or any part thereof, to solvent and responsible parties, then they and not Robison, were subject to the liability sought to be enforced by this action.
The liability here referred to is, that created by the 11th section of the charter; a section which'is in these words: “The persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof that each individual or company may hold in said bank for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt, and no stockholder shall be relieved from such liability by a sale of his stock, until he shall have caused to have been given, sixty days notice in some public gazette of this State.”
Two things seem to be clearly expressed by these words; 1st. That the stockholders are to be under a certain liability, at least whilst they are stockholders: 2dly, that they are not to be relieved from this liability, whatever it is, by a sale of their stock, until they have caused to be given sixty days notice of the sale in some public gazette.
The question then is, what is this liability which they are under ? The section says, it is a liability “ for the ultimate redemption of the bills or notes issued by the bank.” The words “ bills or notes issued by the bank,” are certainly such, that they will include, in the case of any stockholder, at least, all of the bills or notes that had been issued when he became a stockholder, and all that were issued whilst he remained a stockholder.
Robison sold his stock in 1841. The bills on which, the suit is founded, were issued in 1838. They therefore, at least, are bills to the ultimate redemption of which, his liability extends.
*32 We see no error in the refusal of the Court to give to the jury this, the fourteenth request to charge.
The fifteenth request to charge, was: “ That if the charter of the P. and M. Bank expired by its own limitation on ihe-lst of January, 1856, such expiration extinguished the plaintiff’s debt.” This request was refused; and the question is, was that refusal right ?
When the charter of a corporation expires, all things which ■owe their existence to the charter expire too, unless there is some special law to prevent them from doing so. To deny ¿his, is to deny that, when the cause ceases, the effect ceases _ ¿hat, when the body dies, the limbs die. ’
One of the things which owed its existence to the charter ■of the Planter’s and Mechanics’ Bank, was the bank itself, as a corporation. Therefore, when that charter expired, the bank, as a corporation, was dissolved, unless there was some special law to prevent it from being dissolved.
There was no such law. The acts of 1840, 1841, 1842 and 1843, extend to the case in which there are proceedings for the, judicial forfeiture of a charter; not to the case in which there is an expiration of a charter. The act of 1855 (acts 226) does not seek to prevent the expiration of a bank’s charter, from working a dissolution of the bank.
Consequently, when the charter of the P. and M. Bank expired, the bank was dissolved.
What effect did the dissolution of the Bank have on the debts due from the Bank ? The effect to extinguish them, unless there was some special law, to prevent it from having that effect.
"At common law, upon the civil death of a corporation, all its real estate remaining unsold, reverts to the grantor and his heirs ; for the reversion in such an event is a condition annexed by the law, inasmuch as the cause of the grant has failed. The personal estate, in England, vests in the King, and in our country in the people or State, as succeeding to this right and prerogative of the Crown. The debts due to, *33 and from it are totally extinguished.” — Ang. and Ames. Corp. 667.
“ At common law, upon the dissolution of a corporation, the debts due to and from it are extinguished.” Head notes in Hightower vs. Thornton, 8 Ga., 486. Head notes are made by the Judges.
“ Why so much time and talent, labor and learning have been employed to establish a proposition which nobody denies, viz: that the debts of a corporation either to or from 'it are extinguished by its dissolution, I am at a loss to comprehend.” Thornton vs. Lane, 11 Ga., 491.
“ Moreover, I agree that the elementary writers, both in England and the United States, do everywhere assert distinctly, that the debts due to and from a corporation, are extinguished by its dissolution, unless prevented by the terms of the charter itself, or by aliunde legislation ; and, that in the Courts of both countries, this doctrine may now be considered too well settled to be overthrown or shaken; and so totally extinguished, that the members of the corporation cannot recover or be charged with them in their natural capacities.” Lumpkin J. in Moultrie vs. Smiley, 16 Ga. 294.
“For all the purposes of this decision, we have conceded that all corporate rights and liabilities are extinguished by the dissolution of the bank on the first of January 1852.”— Lumpkin J., Id. 324.
“ The difficulty which has arisen, as I think, grows out of an error in applying the common law rule, that upon the dissolution of a corporation, its real estate reverts to the grant- or ; its personal estate goes to the Crown, (in this country to the State,) and its debts are extinguished, to the case made against these plaintiffs in error.” Starnes J. Id. 331.
To the same effect are the decisions elsewhere made. See White vs. Campbell et al. 5 Humph, 38 ; Paschall vs. Whitsett, 11 Ala. N. S. 472; President &c. of Port Gibson vs. Moore, 13 Smedes and Mar. 158; Fox. vs. Horah, 1 Ire. Eq. R. 358; Coulter et al. vs. Robertson, 2 Cushman R. 321; Vi *34 ner Abr. Rent, B. b. 4; Edmonds vs. Brown and Sillard, 1 Levinz 237; Mayor of Colchester vs. Seaber, 3 Burr. 1866 see my opinion in Moultrie vs. Smiley, 16 Ga. 344 et Seq., and in Robinson vs. Lane, 19 Ga. 380 et seq; Vin. Corporations (I.) 6 (I. 3 7) 11.
There is, then, universal accord in this; that the rule of the common law is, that on the dissolution of a corporation, the debts due to and from it are extinguished. Extinguished is the word.
According to this rule, therefore, the effect of the dissolution of the Planter’s and Mechanics’ Bank, was, to extinguish the debts due from the Bank.
But whatever extinguished the debts, as against the Bank itself, equally extinguished them, as against the Bank’s stockholders ; for these were only ultimately liable for those debts; that is, liable only after the bank; and it is a general principle of law, that whatever extinguishes the debts, as to the party primarily liable, equally extinguishes it as to the party secondaiily, or ultimately, liable.
According, then, to the common law rule, when the Bank was dissolved, the debts due from it, were extinguished, both as to itself, and as to its stockholders.
I am aware that this conclusion is denied and denied on the ollowingargument: the reason of the common law rule is, hat, on the dissolution of a corporation, there is, commonly, left no person to sue, or be sued, for the debts due to and from it; but, on the dissolution of this corporation, there were left persons to be sued for the debts due from it on its bills, viz., the stockholders; therefore, as it regards those debts oí this corporation, the reason ceasing, the rale ceased, and they were not extinguished. 16 Ga. 294. But I meet this argument with three answers, any one of which is, I think, sufficient :
1. Courts cannot set aside a plain rule of law, on a mere conjecture; on, what they guess to be the reason of the rule . and, it is the merest conjecture, that the want of some per *35 son to sue or be sued, is the reason of this rule ;• nay, a conjecture against which, there is to be set, another conjecture, equally plausible ; viz., a conjecture that the reason why the law extinguishes the debts of a dissolved corporation, is, that the law first strips it of all its means of paying those debts,, by causing its lands to revert, and its goods to escheat.
2. Numerous cases exist in which, there was somebody to sue and be sued, and yet, in which, the rule was applied. (See cases above.) In the case of the President &c., of Port Gibson vs. Moore, there was the very corporation itself to be sued ; for the dissolved corporation had been revived. In the Mayor of Colchester vs. Seaber, there was an old charter, and a new. Seaber’s defence was, that the corporation created by the old charter, had been dissolved, and,-that his bond given to that corporation, was, consequently, extinguished — and, that being thus extinguished, it could not be collected by the new corporation, although that was the old corporation, revived. This was his defence; and it shows on its face, that there was some one to sue and be sued, — the revived corporation to sue, and Seaber- to be sued. Yet the defence was not demurred out. No; it was met by a denial of the allegation, that the old corporation had been dissolved. Had that allegation been true, there was no question, with Court or counsel, but that the defence would have been good. In Edmonds vs Brown and Sillard, Brown and Siílard had signed their names to the bond of the corporation. Yet, when it appeared, that the corporation had been dissolved, a nonsuit was granted in their favor. The case did not go off on the plea of non estfactum, though that was in. It could not go off on that plea, for the plea was not true. Brown and Sellard did sign the bond, and the bond, thereby, became their deed. This is the foundation case. Here were persons to sue, the actual subscribers to the bond. Yet the rule was applied.
These three cases are but samples of those above cited.
3. It is not true, that, as it regards the debts of this Bank *36 •due on its bills, the reason of the rule ceases. Those debts were the debts of the Bank, as well as of the stockholders ; :and, when the bank was dissolved, there was n'o person left to be sued for them, in so far as they were the debts of the bank. The reason, then — the want of somebody to be sued — ■ existed, for applying the rule to them, in so far as they were the debts of the bank. According to the very argument itself, then, the rule applied to the debts in so far as they were the debts of the bank. But if the rule applied to them to that extent, it extinguished them to that extent; Tor it certainly extinguishes, wherever it applies. And, if it extinguished the debts in so far as they were the debts of the bank, that was also extinguishing them in so far as they were the debts of the stockholders — for the debts were debts on. which, the bank was bound as the primary party, and the stockholders, only, as the ultimate parties; and the extinguishment of the debt, as against the primary debtor, is its extinguishment, as against all the other debtors.
For a fuller notice of this argument, I refer to my opinion in Robison vs. Lane 19 Ga. 380 et seq.
I repeat, then, that, according to the common law rule, when the bank was dissolved, the debts due from it, were extinguished, both, as to iself, and as to its stockholders.
In the language of Chancellor Kent — “ According to the old settled law of the land, where there is no special statute provision to the contrary, upon the civil death of a corporation all its real estate remaining unsold, reverts back to the origi. nal grantor and his heirs. The debts due to and from the corporation are all extinguished. Neither the stockholders nor the directors or trustees of the corporation can recover those debts, or be charged with them in their natural capacity.” ' 2 Kent Com. 307.
Is there any special law to prevent the rule from applying to the debts of this bank. Neither the Act of 1840, or that of 1841, or that of 1842, or that of 1843, is such a law — for *37 each of those Acts is confined to the case of a corporation whose charter is sought to be forfeited by [a judgment of Court.
There is, it is true, the Act of 1855; (Acts 226 ;) but that is not, I think, such a law. The reason I have for thus thinking, I will state in the latter part of this opinion.
For the present, then, I say, that there was no special law to prevent the common law rule from applying to these debts, and therefore, that it did apply to them, and extinguish them, both as to the bank and'the stockholders.
The effect, then, which the dissolution of the bank had on the debts due from the bank, was to extinguish them, both as to the bank, and as to the stockholders.
But the bank, as a corporation, was not the only thing which owed its existence to the charter; the liability of the stockholders for the ultimate redemption of the bills of the bank, was another thing which equally owed its existence to the charter. See 11th section of the charter. It must equally follow, therefore, that when the charter expired their liability expired. Whatever reason there is for saying, that the corporation itself expired on the dissolution of the charter, there is also for saying, 'that this liability expired on the dissolution of the charter. The existence of the corporation, was, in no greater degree, caused by the charter, than was the existence of the liability. On the, other hand, the existence of the liability, was as exclusively due to the charter, as was the existence of the corporation. If the maxim, the cause ceasing, the effect ceases, applies to the corporation, it equally applies to this liability.
I might then rest the proposition, that when the charter expired, the liability of the stockholders expired, on this axiom: that when the cause ceases the effect ceases. But there is abundance of authority, to support the proposition. I merely refer, in this place, to a single case, and to the cases which it cites, and that is, the case of the Bank of St. Mary’s vs. Clayton—12 Ga. 475.
*38 There is no special law at all touching this liability of the stockholders.
It is true, then, that when the charter expired the liability of the stockholders, which orved its existence to the charter, also expired.
This is the same conclusion whiclfjwe had obtained from the proposition, that when the bank was dissolved, the debts due from it, were extinguished.
Thus, then, we have the conclusion from two different and independent sources.
And is it not a conclusion in perfect harmony with other results of the dissolution of a bank ? They are, that the dissolved bank shall be stripped of all its property and effects —that its lands shall revert to the grantor; that its goods shall escheat to the State; that the debts due to it, shall be extinguished. Ought it not to be, then, also, that the debts due from it should be extinguished ? When the law gets all of a bankrupt’s property and effects, it extinguishes the debts against him. This is the principle of bankrupt laws.
And, then, to dissolve a bank in the face of such results, without providing against them, must be an act of mere reckless mischief, sufficient to deprive those at whose instance it is done, of the right to complain, if, when the question comes, which, among innocent parties, are to be preferred, they are left out. Ought they to stand on as good a footing, as the accommodation drawers and endorsers for the bank, or as any guarantors or sureties of the bank. And the stockholders, by the very terms of their engagement, are nothing but guarantors or sureties for the bank. But for those terms, they would, no more, be at all liable for the debts of the bank, than would any other strangers. They have suffered once already by the bank; they have lost all the money they put in it, for stock — and it was that money, really, which the creditor in dealing with the bank, agreed to look to, as his principal debtor. The stockholder, then, is, *39 trot only, by the terms of his contract, but by the principles <of equity, Only a surety.
Now what is offered in opposition to this double conclusion? That either set of the premises from which it is drawn, is not true? No. That it is a conclusion not authorized by those premises ? No. What then? This, that if is a conclusion in conflict with the decisions of this Court; and, that, this Courtis bound to follow those decisions,by the maxim, stare decisis.
I proceed then, to inquire, first, whether it is true, that the decisions of this Court are in conflict with this conclusion. Secondly, whether, if that is true, as to them, or any one of them, this Court is bound to follow them by the maxim, stare decisis.
First, then, is it true, that the decisions of this Court, are In conflict with this conclusion ?
Now it cannot be that they are, unless the cases in which they were made, are analogous to this case. Let us bear in mind then, what this case is. It is, in the first place, a case against a stockholder, not, against a director; and, in the second place, it is a case in which, the defence is, the extinction of the charter, not its forfeiture by the judgment of a Court.
And let us also bear in mind the following things. There is an act of the legislature, the act of 1842, (Colb Dig. 118,) which, referring to this, and other banks, then suspended, has these words. “ The Judge shall pronounce the judgmen. of the dissolution of said corporation for all purposes, what soever, saving and excepting, as to its power in its corporate name, to collect and pay its debts, and to sell and convey its estate, real and personal.” By these words, manifestly, the dissolution to be brought about by a judgment, was to be, not really a dissolution at all; certainly, not a substantial or total dissolution, but was to be, no more than a formal or partial dissolution. Now the difference between such a dissolution, and a substantial or total dissolution's nearly as great *40 as is the differencebetween no dissolution at all and dissolution. Consequently, it might well be, that extinguishment of the corporation’s debts, would not follow such a dissolution, and yet, would follow a substantial dissolution — such a dissolution as is wrought, by the expiration of the corporations charier. It must follow, that cases in which the dissolution was, by the judgment contemplated, (or held to be contemplated,) in the act aforesaid, are not analogous to cases in which, the dissolution was,by the expiration of the Charter, and, therefore, that the maxim, stare decisis, cannot apply between the two sets of cases.
Bearing these matters in mind, let us proceed to the decisions.
The first of the decisions is that in Lane vs. Morris (8 Ga. 468.)
In that case, the action, as, in the present, was against a stockholder of this bank, and a defence was; “ that if the defendant ever was a stockholder, all his rights and liabilities, except so far as saved and reserved by statutory provision, had long since ceased and determined, by the forfeiture of the charter of said bank, viz: on 13th June 1843, as appears by the judgment of the Court declaring the forfeiture.”
The defence, then, is, forfeiture or dissolution by judgment-, and it is a defence which i tself admits, that liabilities were saved by “statutoryprovision” — doubtless meaning the said Act of 1842.
There is, therefore, between this case, and the one in hand, the very want of analogy above adverted to. The decision in it, therefore, cannot be a law for the decision of the case in hand — and this is true, no odds what the grounds might be, on which the decision was put.
It is not clear, however, what the grounds were, on which the decision was put. The decision was, that the defence was not good, but whether the ground of the decision was, the act aforesaid of 1842, or was something else, is not stated.
*41 What the Court said, was as followsCounsel for the defendant below and in error, argued, that upon the dissolution, of this corporation the debts due to and from it were extinguished ; and that nothing could save the case from the operation of this common law principle, but the legislation which had intervened, appointing a receiver to collect and pay over the asseis, that, consequently, all proceedings must be conducted in his name, and that a party who claims the benefit of this 'legislation, must pursue his remedy in accordance with it. The Court sustained this position and ruled that the action could not be maintained by the present plaintiff, but that under the Act of 1842 and 1843 appointing an assignee, suit could be brought by him only, and no one else.”
"In the opinion of this Court, the right of the billholder, under the 11th section of the charter, to hold the personal property of the stockholder pledged and bound for the ultimate redemption of the bills and notes of the bank, in proportion to the amount of his shares and the value thereof— a right which is not primiary and total, but secondary and proportional — is one which he may assert in his own name, before or after the formal dissolution of the corporation; one which is wholy above and beyond the reach of any legislaion, and independent and irrespective of it. The power and' duty of the receiver, appointed by the legislature was to take charge of and collect as early as practicable, the debts and demands du'e and owing to the bank, and to pay off and discharge its liabilities. See Pamphlet Acts 1842, p. 29, 1843 p. 21, 22. But the recovery in this action constitutes no part of' the assets of the bank, but is a supplemental or superadded security for the benefit of the billholder — one which he is authorized to enforce in his own name, in an action of debt at law directly against the stockholder.” (476.)
“ After the formal dissolution of the corporation” — what did the Court mean by this word, formal which it italicised? Did it not mean, the sort of formal or partial dissolution di *42 rested by the Act of 1842? We are bound to suppose, that it meant a sort of dissolution, like that which existed in the case it was deciding, and that, was the dissolution directed by the Act, — provided, the judgment declaring the dissolution, was in accordance with the Act, or, if not in accordance with the Act, was void for the difference. The judgment was not in accordance with the Act; it was a judgment of substantial and total dissolution, and thus, it was not in accordance with the Act. But this Court has held, (I dissenting,) that the judgment was void for the difference, or, was to be construed as not differing from the Act. 19 Ga. R. 337.
I think, then, that we are authorized, if not required to say, that the Court meant by the expression, “the formal dissolution of the corporation,” the sort of dissolution directed by the Act of 1842, which, as we have seen, was no dissolution at all.
If this was the Court’s meaning, then we may say, that the Act of 1842, was theground of the decision.
Another reason for saying this, is, that in subsequent cases, .the Act is more distinctly made the ground of the decision, as we shall see. (11 Ga. 492; 19 Ga. 347-354.)
So much then, for the first of the decisions. It is seen to be a decision which was made in a case differing, essentially, from the present, and which was put as far as appears, on that very difference.
Only two Judges, (Judges Lumpkin and Nisbet,) sat in the case; and against those two, was the opinion of the Court below.
The next of the decisions, is that made in Hightower vs. Thornton, (8 Ga. R. 486.) There is much less analogy between that case and the present, than there is between the last case and the present.
The facts were these. Hightower had a judgment against Thornton, a stockholer in this bank — a judgment founded, not on the bills of the bank, but on a certificate of deposite of *43 the bank. The bank was insolvent, and Thornton owed it a part of his subscription for stock. Hightower brought a bill against him, alledging these facts, and also alledging, that the charter of the bank, had been forfeited by a “ decree” of the Court, and praying that Thornton might be compelled to pay up the unpaid part of his subscription, and that the money thus paid up, might be applied to the satisfaction of the judgment.
Now here, the dissolution was not a dissolution by expiration of charter, but was the very same dissolution as that in the last case, viz; a dissolution by “decree” — by judgment of the Court, and, therefore, was a dissolution affected in the same way, by the act of 1842, as, that was.
In this respect, then, there is precisely the same want of analogy between the case and the present case, as there was found to be, between the last case and the present case.
But this is far from all. The bank had, previous to the “ decree” of forfeiture, made “ an assignment of all its property real and personal, and all its debts, credits, and effects, to trustees,for the benefit of all its creditors and stockholders;” and the legislature had declared, that this assignment was to “be taken, held, and considered, valid for all purposes, both in law and equity.” Cobb 121.
This assignment, then, conveyed to the trustees all the property, and all the debts, credits and effects, belonging to the bank, and thus placed them where they could not be reached at all by any dissolution of the bank, even one, the most total and absolute. Therefore, if the unpaid subscriptions made a part of the property, or of the debts credits and effects, belonging to the bank, the assignment conveyed those unpaid subscriptions, to the trustees, and thus placed them entirely beyond the reach of any dissolution of the bank, even a dissolution the most total and absolute.
Now, the decision of the Court was, that the unpaid subscriptions di'd make a part of the property of the bank — that they were “ a trust fund for the payment of the debts,” of *44 the bank. (503.) Consequently, the Court must have held, that they went, with the rest of the property, debts, credits-, and effects, to the trustees, and thus, got beyond the reach of a dissolution of the bank. Accordingly, the direction the Court gave to the case was, that the unpaid subscriptions must be sued for, in the name of the trustees or assignees.
The Court having made this decision, put the question of the effect of the judgment of forfeiture on the debts due to and from the bank, entirely out of the cases; for, according to the decision, the unpaid subscriptions had ceased to be debts belonging to the bank, when the judgment was rendered, and had then become debts belonging to the trustees, in trust for the creditors and stockholders.
In this second respect, then, there is, if possible, a still greater want of analogy between the case, and the present ease, than there was found to be between them in the first respect.
Now, it must be manifest, that where there is such a want of analogy between two cases, as there is between these two, no argument can be made from the one to the other.
This case of Hightower vs. Thornton was decided at the same term as the last case; and the same two judges presided in it, and the decision had against it, the opinion of the same lower Court.
So much for the second of the decisions
The next of the decisions is that in Thornton vs. Lane (11 Ga. R. 459.)
In that case, the action was against Thornton, a stockholder of this bank, on the same 11th section of the charter of the bank; and one of the defences was, the forfeiture of the charter by judgment of the Court.
Here again, is the very same dissolution that there was, in the two former, cases, viz; a dissolution by judgment, not by expiration of the charter. Consequently, this case falls, in this respect, as much within the act of 1842, as those two did, and therein, differs, as they did, from this case. And *45 the Court makes the difference a ground, if not, the ground, of its decision. The Court says :
“ Why so much time and talent, labor and learning, have been employed to establish a proposition which nobody denies, viz: that the debts of a corporation, either to or from it, are extinguished by its dissolution, I am at a loss to comprehend. Certain it is, that it was recognized by this Court at this place two years ago, as it had been on more than one occasion previously.”
“ In Hightower vs Thornton and others (8 Ga. R. 4 86,) this Court says, upon the threshold of this argument, we aré met, with the common law principle, that upon the dissolution of a corporation, all the debts due to it and from it, are extinguished. A doctrine which results necessarily from the fact, that the corporation having expired, whether by its own limitation, by surrender, abandonment of its members, or judgment of dissolution, there is no one in law to sue or be sued.”
“That this doctrine is “ odious” is evidenced by the fact, that a majority of the American States have already by their “•enlightened legislation” “ interposed to prevent, toward off the iniquitous consequences” of this common law rule, the existence off which, I take it upon myself to affirm,is “a disgrace to a civilized State.” Georgia is not obnoxious to this reproach, as far as this corporation and others in its vicinity, in pari delicto, are concerned. She has made ample provision to rescue them from the operation of this rule. Such being the rule however, and the foundation of it, this Court does not feel itself called on to extend it one jot or title, beyond the reason which gave it birth.” Ib 493.
Georgia” “has made ample provision to rescue them,” (this bank being one of them,) “ from this rule.” This, is as much as to say, that, but for this “ provision,” they would have been subject to the rule, and, therefore, it is making this “ provision” the very ground of the decision. What “ provision” was this ? Doubtless the Act of 1843, which declares, as we have seen, that “the judge shall pronounce the judg *46 meat of the dissolution of said corporation for all purposes whatsoever, saving and excepting as to its power in-its corporate name, to collect and pay its debts and to sell and convey its estate real and personal” (Cobb 118.) But in this Act, is nothing about dissolution from expiration of charter. Georgia has made no “provision” “to rescue” a corporation dissolved by expiration of charter, from “ the common law rule.” That corporation, then, is still subject to the rule.
The case, then, stands'on precisely the same footing as that of Lane vs. Morris, the first of the two already considered. And so thought the Court itself, for they say; “ We are content, therefore, after the most mature reflection to reaffirm merely on this point the views which we expressed when it was first presented for our consideration, in Lane vs. Morris,” &c.
I pass to the next case, which is the Bank of St. Marys vs Clayton. (12 Ga. R. 475.) This, it is true, is not a “bank case,” but it is a case, for all that, much more like the present, than are any of the “bank cases” which I have noticed.
“This was an action brought upon the information of Philip A. Clayton, against the Bank of St. Marys, for the recovery of the penalty imposed by the Act of 1835, for the issuing of change bills.” After the commencement of the suit, but before judgment, the Legislature repealed the Act of 1835. One of the provisions of the Act of 1S35 was, that “Any bank or body corporate or person or persons whomsoever, offending against the provisions of this Act, shall forfeit for each offence the sum of $500, to be recovered and applied as provided for by the second section of the Act hereinbefore recited.” That section was as follows: “Any bank or corporate body, or person or persons whomsoever, offending against the provisions of the first section of this Act, shall forfeit the sum of one hundred dollars, to be sued for in the name of the State by any licensed attorney, on the application of any informer cognizant of said offence, who shall be a competent witness on the trial, and recovered by an action of debt or *47 on the case, in any Court of competent jurisdiction in this State, with full costs; one-half whereof when recovered, shall be paid to the use of the State, and the other half to the use of the informer.”
The penalty is “tobe sued for,” “on the application of any informer.” Of course, then, the right to sue for the penalty, and by the suit, to recover the penalty, is to vest in the informer. True, the Act says, that the money “ when recovered,” is tobe paid, one-half to the State, and the other half to the informer; but this is not saying, that the right to these halves, respectively, is not to vest before the recovery. The time when money is to be paid, is no test of the time, when the right to'the money vests. Debitum in presentí, solvendum in futuro, is a common case. Suppose this penalty paid after suit, but before recovery, would not the informer be entitled to one-half of it ? Surely he would.
Under this Act, then, the right to sue for the penalty, vests in the informer. Clayton, the informer’s, suit, was in the assertion of this right, and whilst the suit was pending, the Legislature repealed the Act. . In the present case, the charter gave Beall the right to sue Robison, as a stockholder; his suit was in the assertion of that right, and whilst the suit was pending, the charter expired. Here is analogy.
What was the decision ?
Let the words of the Court answer.
“ But the main question in this case is, whether any judgment can be rendered in an action founded on a penal statute, after its repeal.”
“ We are clear, both upon principle and precedent, that a penalty cannot be recovered after the expiration of the law which imposes it, either by its own limitation, or a repeal by the power which enacted it, without an express provision to that effect,in the repealing statute; and that it makes no difference whether the penalty, when recovered, goes entirely to the public or to the informer, or whether, as in this case, it is divided between them.” 12 Ga. R. 481.
*48 Many cases are cited, sustaining this position. Of these, I will refer to but two, one, decided by an English Court, the other, by the Supreme Court of the United States.
The former is thus stated in the decision: 12 Ga. 485.
“Under the insolvent debtors act, (1 George III,) one Miller was compelled, by a creditor, at the sessions at Guildhall, to give up his effects, and he accordingly signed and swore to his schedule. But some circumstance arising, the Court adjourned his discharge till the next sessions. In the mean time the statute 2 George III passed, which repealed the compelling clause. Motion for a mandamus to the justices now to proceed to grant Miller his discharge, the jurisdiction having attached before the clause was repealed. But by the Court: Nothing is more clear,than thatthe jurisdiction is now gone, and that we cannot grant any such mandamus. Even offences committed against the clause (while in force,) could not have been now punished without a special clause to allow it; and therefore a clause is inserted in the repealing statute fof that purpose. 1 W. Blackstone’s Rep. 451.”
In this case, the insolvent debtor had given up his effects, had signed his schedule, and had sworn to it; had done all that he was to do. But he had not obtained his actual discharge. The Act giving him the right to the discharge, was repealed. The Court held, that the right went with the statute giving it.
The latter of the two cases, is thus stated in the decision ; Id. 493.
“The same doctrinéis enforced in the recent case of Norris vs. Crocker et al. 13 Howard’s U. S. Supreme Court Rep. 434. And as this case covers all the points made upon this record to the fullest extent, I felt strongly inclined to rest our judgment upon its authority alone.”
“It was an action of debt, brought by the owner of a fugitive slave, to recover the penalty of $500, under the Act of 1793, against the defendants, for harboring his slave. While this suit was pending, the Act of 1850, was passed, known *49 as the fugitive slave law. Defendant pleaded as a defence that the Act of 1850, repealed by implication the Act of 1793, and consequently, abated the suit. The Court held that the Act of 1793, was repealed by implication; and then used this strong language'
“The next question referred to us for decision, presents no difficulty. The suit was pending below when the Act of September, 18, 1850, was passed, and-was for the penalty of $500, secured by the 4th section of the Act of 1793. As the plaintiff’s right to recover depended entirely on the statute, its repeal deprived the Court of jurisdiction over the subject matter; and, in the next place, as the plaintiff had no vested right in the penalty, the legislature might discharge the defendant by repealing the law. We, therefore, answer to the second question certified, that the repeal of the 4th section of the Act of 1793,does barthis action although pending at the time of the repeal.”
Here, the U. S. Court say, “ As the plaintiff’s right to recover depended entirely on the statute, its repeal deprived the Court of jurisdiction of the subject matter;” so, Í say, in the present case, that the billholder’s right to recover, depended entirely on the charter, and, therefore, that the expiration of the charter, deprived this Court of jurisdiction over the subject matter.
These two cases, as well as the principal case, itself, were cases in which, that on which the right depended — the statute — died by repeal — a sort of death to take men by surprise; the case in hand, is one in which, that on which the right depended — the charter — died by the expiration of the originally allotted term of its life — a sort of death for which men ■might he prepared, this term of its life being a thing known to all men. Consequently, there is less interference with “vested rights,” to hold, that in the latter case, the right died with that on which it depended, than there is, to hold, that in the .former cases, the right died with that on which, it depended,
*50 It is true, that in the principal case, the right was a right to a penalty. But what is the difference between the case in which, the right is a right to a penalty and the statute giving the right has ceased to exist, and the case in which, the right is a right to a suit against a stockholder and the charter giving the right has ceased to exist? None, I say. There can, ' no more, be anything in the latter right, to enable it to survive its cause, than there is in the former right, to enable it to smvive its cause. Equally, in both cases, the cause of the right ceasing, the right itself, the effect, must also cease. It may be true, that a charter will not, so readily cease to exist, as will a statute giving a penalty; it may be true, that there is no legislative power to repeal a charter, when there is such power to repeal a statute giving a penalty — but yet if, by any means, the charter does cease to exist, it surely is as dead, as the statute is, when it ceases to exist. Now, in the present case, there can be ho doubt, that the charter did cease to exist; it expired by its own limitation. Then, there can be no difference, between the two cases.
And in each case the right was a chose in action — was but a right to sue. When the crime was committed, the informer acquired the right to sue the criminal; when the bank failed, the billholder acquired the right to'sue the stockholder. The two rights were precisely alike, with respect to the degree of their perfectness. Therefore, if it be true, that the nformer’s right was “ inchoate,!’ so, equally, must it be true, that the bill holder’s right was “inchoate.”
' I remark, that the repealing Act contained a provision remitting the penalties incurred under the repealed Acts; but the Court makes no use of this provision; the Court puts its decision, exclusively, on the repealing provision; and well it might, for the two provisions include each other. To repeal a right, is to remit the corresponding liability; to remit a liability, is to repeal the corresponding right. And so, to repeal the right to these penalties, Avas, to remit the liability to pay *51 the penalties; to remit the liability to pay the penalties, was, to repeal the right to the penalties.
The English case, however, was. not the case of a right to a penalty. It was the case of a right to a discharge under the insolvent laws — a right that commends itself to favor, (our Constitution and laws being the judge,) as much as any right can.
This case of the Bank of St. Marys vs. Clayton, and the two cases cited from it, and, I may add, the other cases in it, are, then, all similar to the present case, in every essential particular; and the decision in it, and the decisions in them, were, not against, hut, for, the proposition, that, when a charter expires, the rights depending on it also expire. If, therefore, contrary to what I have supposed, the intention of the three former decisions, was, not, to put themselves upon the special law of 1842, which directed only a “formal” or partial dissolution, but was, to deny this proposition, then with them, comes in conflict this later decision, and all those decisions on which it rests.
I pass to the next decision, that made in Moultrie vs. Smiley, 16 Ga. 289.
In that case the action was against the Directors of the Commercial Bank of Macon, and was founded on that provision of the bank’s charter, which makes its directors liable for any “excess” of indebtedness.in the bank, beyond “three times the amount of their stock paid in, over and above the amount of moneys actually deposited in their vaults, for safe keeping.”
The defence was, that pending the suit, the charter had expired'.
The case, then, is like this, except, that this is against a stockholder, while it was against directors.
The decision was, that the defence — the expiration of the charter — was not a good one; but the decision wasnot unanimous, I dissented from it.
*52 The difference between the case and this case, in the view which I took of the case, is not material; but, in the view which the other two members of the Court, took of the case, that difference is, perhaps, to be considered material.
They seemed to think, that the liability of a director, is primary and independent, not secondary and dependent, like the liability of a stockholder, which is only ultimate.
Lttmpkin J. says, “ I am not prepared to say, that the directors in this case, who were guilty of the mismanagement, would not be individually liable to billholders, independent of this statutory provision.” Id. 317.
Again, “who is the obligor and obligee,the promissor and promissee,under the Sth rule ? Is it not the directors, under whose administration the excess was committed, on the one part, and the billholder on the other? What is it to them that the charter of the Commercial Bank of Macon, expired on the 1st day of January, 1852.” Id. 317.
Again, “ For quoad hoc they” (the directors) “ are the body, and the corporation but the limbs. They are the head and front of this offending.” Id. 320.
Again, “ So, then, to make the definition from Burrill available, it should have been reversed. The legal maxim is, Jlccessorium non ducit sedsequitur suum principale. That the incident docs not lead, but follows the principal. Whereas, here, the extinguishment of the collateral is made to work the extinguishment of the direct liability. In this instance, neither controls, but the one is wholly independent of the other.” Id. 321. Wholly independent oí the other, is a strong expression.
Again, “This suit is brought to enforce a distinct, separate and independent undertaking.” Id. 323.
tj Distinct, Separate and independent, _are words quite as strong.
JS'ow if one liability is “wholly independent” of another— if it is “distinct, separate and independent” of another, it certainly is true, that it cannot be affected by anything whatev *53 er, that may happen to the other; and, therefore that it cannot be affected, by the extinguishment in any mode, of the other.
Judge Starnes seems to have entertained the same view. He says, “ what show of reason is there in the proposition, that because the charter of the bank has been forfeited, andéis debts are in this way extinguished, although this excess has never been paid, yet that no recovery can be had for and on account of it, against these defendants, who are severally and independently liable to pay it?” Id. 332.
Again, “The right to hold these directors responsible, cannot be said to depend alone, on the contract between the State and the corporators, but springs out of the statutory liability of these defendants, which, if not ex contractu is quasi ex contractu, and was incurred by each director when this excess happened.” Id. 333.
It is not then, perfectly clear, that even this decision means to say, th,at the liability of a stockholder, which is only ultimate, and which is not independent of the liability of the bank, is not extinguished by the expiration of the charter-At most, however, it was but the decision of two, out of the three, members of the Court, the opinion of the other member being, that the liability expired with the charter,
I pass to the next of the decisions, that made in Robison vs. Lane, 19 Ga. R. 337.
That case differed from this only in one particular. The defence in it, was, a. judgment of forfeiture of the charter; in this, the defence is, .the expiration of the charter.
The Court was requested to charge, that if the charter “was absolutely and unconditionally forfeited, without reservation of the rights of plaintiff, and without retaining and continuing the liabilities upon the defendant, then all the debts due to and from said bank became extinguished.” The Court • refused so to charge, and that refusal made the question for this Court.
*54 The decision of this Court, (I dissenting,) was, that the Court below was right in its refusal.
The main, I think I may say, the only, ground on which Lumpkin J. put his opinion, was, the same old ground existing in Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane; viz: special legislation — the said act of 1842y with the kindred acts of 1840, 1841, and 1843.
He says, “ In Thornton vs. Lane, (l 1 Ga. R. 493,) in speakng of the odiousness of the old common law rule, that upon the dissolution of a corporation, the debts due to and from it are extinguished, and which, thank God, I have lived to see itself extinguished, by an authority not subject to review, I remarked, that c Georgia is not obnoxious to this reproach so far as this(corporation,’ (the P. &M. Bank of Columbus,) ‘and others in its vicinity in pari delicto, are concerned. She has made ample provision to rescue them from this rule.’ ”
“Let us glance for a moment at some of the enactments on this head.”
He then gives the material parts of the Acts of 1840, 1842, and 1843,quoting that part of the Act of 1842 which required, that “the Judge should pronounce the judgment of dissolution for ail purposes whatsoever, saving and excepting, as to the power in its corporate name, to collect and pay its debts, and sell and convey its estate real and personal.” And then he exclaims, “ And yet iri the face of all this legislation and of this assignment by the bank, before its charter was forfeited, and of the legislative confirmation thereof, it is insisted that the liabilities of this corporation, and consequently, the personal liability of the stockholders, is extinguished! -and wherefore? Suppose, it be true, that the debtors of the bank and the stockholders contracted in reference to the common law rule? Is it not equally true, that they contracted also in reference to the acknowledged right of the legislature to rescue the assets from this principle? And is-not the one to be taken as much an element of the contract as the other. ?” Id. 347-8-9
*55 Again, he says, “ Suppose it be. true, that apart from the Acts of 1840, 1841,1843 and 1843, the debts due to and from the bank would have perished with the corporation, how'can it be pretended that they are not saved by the statutes.” Id. 350.
And what is here said by Judge Lumpkin, shows that the view which I have taken of Lane vs. Morris, Hightower vs Thornton, and Thornton vs. Lane, viz: that they were put upon these same statutes, is the true view.
It is true, that Judge Lumpkin says, (347,) “my mind has never wavered for a moment upon this question^” (that of extinguishment.) “ Whether considered upon general principles or upon our own special legislation relative to the subject;” but he does not state the general principles to which he refers, and he does state very fully the “ special legislation relative to the subject.” At any rate, the special legislation was there to be relied on, whilst it is not here tobe relied on. Besides, he only speaks in the first person.
Judge McDonald also, had special grounds. He consid" ered the case essentially different from the present, and rested his judgment, exclusively, on that difference. Had the case been, like the present, on the expiration of the charter, his judgment would have been, the opposite of what it was. He said, “ I have no doubt, that, according to the common law, on the civil death of a corporation its debts are extinguished, and I have as little doubt that the legislature has power to prevent that effect. A corporation is factitious; and if the power which creates it, in the act of its creation, or by subsequent constitutional enactment, makes no provision for preserving and continuing the debts due to and from it, on its absolute dissolution, they perish with it — they become extinct.”
“ If the charter of the Planters and Mechanics Bank was repealed or annulled, and the corporation was absolutely dissolved thereby, unless they have been prevented by compe *56 tent constitutional legislation the consequences ensue to which I have adverted.” Id. 354.
This decision, then, is really a decision in favor of the proposition, that when a charter expires, the rights depending on it expire too. Two Judges, at least, expressly sanctioned that proposition. And as for the third, he thought the case rescued from the common rule, by special legislation— legislation which, as ho conceived, prevented a dissolution, (an expiration) of the charter.
The dissenting Judge thought, that, as the judgment was in terms, *one of .absolute and unconditional forfeiture and seizure of all the franchises, including “ that of being a body corporate,” its effect was, of itself, to dissolve the corporation; that, even if it was erroneous, yet, that it was binding until set aside, especially as it had been acquiesced in, for twelve years.
I pass, then, to the next and last of the decisions, that made in Moultrie vs. Hoge, (21 Ga. R. 515.)
That was a case in which, the persons sued, were directors in the Commercial Bank of Macon. Tho defence was, the expiration of the bank’s charter.
The case, then, was like this, with the exception, that in this, the defendant is a stockholder, not a director.
The decision was, “ that by the expiration of the charter of said bank, the ‘cause of action became extinguished.’” Lumpkin J. dissenting.
This decision, then, sitpjjorls the proposition, that when the charter expired, in tho present case, the liability of the stockholders also expired.
To sum up, the question is, Is it true, that the decisions of this Court are opposed to tho proposition to which I came as a conclusion, viz: That when this charter expired, the liability of the stockholders expired with it.
Three of the cases, Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane, were cases in which, there was no expiration of the charter at all, but only a judgment of for *57 feiture; and there was a special law which, directed that this judgment should not extend so far as to deprive the hank of the power, in its corporate name, to collect and pay its debts, and sell its property; that is, which directed, that the judgment should not dissolve the bank. This law, the Court thought, was operative and prevented the judgment from dissolving the bank. The decisions were, that the liability of the stockholder was not extinguished. These, then, are not decisions, that this liability would not have been extinguished, if the bank had, really, been dissolved. But in the present case, the bank was, really, dissolved, its charter had expired.
These three decisions, then, are not decisions in opposition to the proposition, which is, that when the charter' expired, (a thing which dissolved the b ink,) the liability of the stockholders also expired. They are decisions which do not touch that proposition. And the decisions themselves, not being in opposition to the proposition, it would make no difference, even if they-were accompanied by some expressions denying the proposition, for, in such a case, the expressions would-be mere obiter dicta; but indeed, the expressions which do accompany the decisions, are such as to justify us in saying, that the decisions were actually put, in great part, if not wholly, on the special law.
In one of these three cases, there was also, the assignment, and the law making it valid ; and that was, itself, a decisive matter in the case.
These three decisions, then, count neither way.
Another of the cases, that of Moultrie vs. Smiley, was a case against directors, and though the Court decided, that the liability was not extinguished, yet, in doing so, it laid great stress on the ground which it took, that the liability of directors, is, distinct, separate, independent, primar]*-. But the liability of stockholders, is only ultimate. It is not quite clear then, that even this decision ought to count as adecis *58 ion in opposition to the proposition, that when the charter expires, the liability of the stockholder also expires.
Let it, however, be so counted. Then there is one of the decisions against the proposition; a decision, however, weakened by being dissented from by a third part of the Court.
Another of the decisions, that in Robison vs. Lane, made by two Judges against one, was, that the liability of the stockholders, was not extinguished, notwithstanding the judgment of forfeiture; but, there was in the case, the special law of 1842, as, in the first three cases; and, on that law, one of the two concurring Judges, in great part, if not wholly, put his opinion; and the other of the two put his opinion on the fact, that the judgment had not been executed, at the same time, saying, that if the case were one in which, the charter “ was repealed or annulled, and the corporation was absolutely dissolved thereby,” the liability would be extinguished. The third Judge thought that the judgment did dissolve the corporation ,and, therefore, that the liability was extinguished. This, then, is a decision which may be countéd in favor of the proposition.
The same may be said of the decision in the Bank of St. Marys vs. Clayton, a decision, that when a statute giving a penalty is repealed, the penalty perishes. And this decision stands on many others, each one of which, has an independent value of its own. This, (throwing away these others,) makes two, in favor of the proposition.
The last of the decisions, that in Moultrie vs. Hoge, was, that when a charter expires the liability of the directors expires. But if the liability of the directors expires, at least as much, if not more, expires the liability of the stockholders, for that, beyond a doubt, is only ultimate. From this, one Judge dissented.
This makes three in favor of the proposition.
Thus then, of the seven decisions, three, count neither way, one counts against the proposition, and three count in favor of it. And of these three, one dates before, and two date af *59 ter, that adverse one, so that it finds itself between the upper and the nether millstone.
If turns out, then, not to be true, that the decisions of this Court, are in opposition to the conclusion, tliat when this charter expired, with it expired the liability of this stockholder.
Did stare decisis require, that these two decisions should not depart from their immediate predecessor ? If it did, it equally, required, that that should not depart from its immediate predecessor? Unless, stare decisis is to be applied, or, not applied, according to the side it favors.
I proceed to the second question.
Suppose it true, that the three first decisions, Lane vs. Morris, Hightower vs. Thornton, and Thornton vs. Lane, as well as the fifth, Moultrie vs. Smiley, are to be coi'mted as adverse to the proposition, that when • this charter expired, with it expired this stockholder’s liability; and suppose the other two decisions, Robison vs. Lane, and Moultrie vs. Hoge, not entitled to be counted at all; then, is this Court bound by the maxim, stare decisis, to follow the four decisions? That is the next question ?
Is a Court bound to follow every decision ? If so, Courts have, from the beginning, been constantly failing to do, what they were bound to do. They have, again and again, time out of mind, overruled cases. There is now, a volume 6^ these cases. The process still goes on, every where. It wont do to' say, then, that a Court is bound to follow every decision.
Which decisions are they, then, that it is not bound to follow ?
In my opinion, they are they, which are clearly contrary to law; especially, if, also, they are recent; are adverse to the current of legal opinion; and, if they betray marks of great repugnance in the Court making them, to the principle which they go to condemn. If it is not clear, that the decis *60 ion is contrary to law, the decision ought, I think, to have the benefit of the doubt, and so, ought to be followed.*
But, when a decision is clearly contrary to law, then, a Court ought not, I think, to follow it; for, if, when that is so, a Court follows it, the Court violates the Constitution of the State, and, if the decision be of a particular kind, and the case one happening anterior to it, violates, also, the Constitution of the United States; and, after all, does more harm than good.
When the Court follows a decision that is contrary to law, it turns that which is contrary to law, into law. This, is to make law. Therefore, the Court makes law. But the power to make law, is a power properly attached to another department of the State government, the legislative department; and the Constitution of the State says: that no Court “shall exercise any power properly attached” to another department of the government. Therefore, when the Court follows a decision that is contrary to law, it violates the constitution of the State. (Art. 1, Sec. 1.)
This is not all. The law thus made by the Court, is of a peculiar character; it works backwards as well as forwards. Why backwards ? Because the Court, that which is to work it, regards it, not as a law made by the Court, and dating, therefore, from the decision, but, as a law made by the legislatuie, and dating from some time anterior to the decision, and merely declared by the decision. Consequently, the Court has to apply it to all cases happening after this anterior time, not even excepting those happening before the decision. And thus, it is a law that works backwards as well as forwards.
Now, suppose the decision be one, increasing the weight of some penal law, or one lessening the weight of some law of contract; suppose, for example, the decision be that death is the punishment for manslaughter, or, that six per cent, is the interest for lent money. Then, the decision, if, the former, and applied to a case happening previously to it, would *61 be an expost facto law; if, the latter, and applied to a case happening previously to it, would be a law impairing the obligation of contracts. And the constitution of the United States declares, that no State ever shall pass any expost facto law, or law impairing the obligation of contracts Therefore, if a Court follows the decision, in either of these cases, it violates the Constitution of the United States.
But even were the two Constitutions out of the way, yet, if a Court follows a decision which is contrary to law, it does more harm than good.
In every instance in which, a Court follows a decision that is contrary to law, it divests vested rights. This, in the cases which happened previously to the decision, is an enormous Avrong and hardship. The sufferers are men, not only innocent, but, positively meritorious — men Avho have kept Avhat was really the law, and Avho could not foreknow, that a decision Avould come along, and say, that it was not the latv, and yet, they are treated as law breakers and wrong doers.
And this is a mischief not to be compensated for, by any good that can come from following the decision. What good can come from following the decision? Men have regulated their conduct by it ? If the decision be clearly contrary to law, men will be chary of regulating their conduct by it; they Avill distrust it, and provide against it. Suppose a decision, made, that a will, or a deed, Avithout a Avitness, is valid, hoAV many men Avould follow it? Very few, if any.
The number, then, that will regulate their conduct by a decision that is clearly'' Avrong, Avill be feAv; and they, we may assume, will consist of the careless, or the speculating classes, neither of which are entitled to much favor. Especially, must this be true, if the decision be recent; if it be adverse to the current of opinion amoug lawyers ; and, if it-betray marks of great repugnance in the Court making it, to the principle which it denies. Now, surely, the good of upholding a small number of such men as these, is not a compensation for the evil of overthrowing such men as those *62 first adverted to. But, even, if this number were greater, there is nothing to exempt them from a principle which is applicable to other men — the principle that all are bound to know the law. What answer then, could they return to the question — Did you not know, that a Court cannot make a law? None.
For these reasons, I think, that a Court is not bound, to follow such a decision.
The question, then, is, if the four decisions now in question, were, as I am assuming them to be, all adverse to the proposition, that when this charter expired, with it expired the liability of the stockholders, is it true, that they would be clearly contrary to law ? I think it is.
To deny, that this liability expired with the charter, is to deny, that the things which depended on the charter for their existence, expired with it; and to deny this, is to deny, that when the cause ceases, the effect ceases; and if to deny, that when the cause ceases, the effect ceases, be not, clearly, contrary to law — to every law — I cannot conceive what would be.
This view, of itself, would be enough. But to deny this proposition, is to deny the authorities ; is to deny the Bank of St. Marys vs. Clayton, and the many cases on which it rests; and, indeed, so far as I know or believe, every other case. As far as I know and believe, there is not one single case, that would support these decisions in denying this proposition.
There is no special Act which comes in, and saves the liability of stockholders from extinction.
But, referring to what I have said on this proposition, in the early part of this opinion, and, to my opinions in Moultrie vs. Smiley, (16 Ga. 340, et seq.) and in Robison vs. Lane, (19 Ga 380, et seq.) I forbear.
Are the decisions recent? Quite so. The oldest was made in 1850, the youngest in 1854. We may almost say, res adhuc sub judice.
*63 Would the decisions, if such, as I am now assuming them to be, have against them, the current of opinion among lawyers ? They would, from the best information I have.
Do they betray marks of great repugnance to the “ common law rule,” that when a corporation is dissolved, the debts due to and from it, are extinguished ? Very great, I think.
In Hightower vs. Thornton, there is quoted with approbation, the remark of Chancellor Kent, made as counsel, and in extreme age, “that to permit the odious and obsolete doctrine of ancient date, before moneyed institutions were introduced, to be now applied to the dissolution of a bank, perhaps by its own mismanagement and abuse, so that all its assets were to be considered as dispersed to the winds, without any owner or power any where, to collect them, and justly apply them, would be a disgrace to any civilized State.” 8 Ga. 493. And no reference is made, to the above quoted antagonist doctrine promulgated by the Chancellor, as a teacher of law in his Commentaries. (Supra and 2 Kent’s Com. 307.)
In Thornton vs. Lane, the doctrine is characterized, as, “odious;” and then, is added, this remark; “the existence of which” (the doctrine,) “I take it upon myself to affirm, is a “disgrace to a civilized Stateand, in another place, this remark; “ the very idea is abhorrent to every principle of justice.” 11 Ga. 492, 6.
In Moultrie vs. Smiley, it is said, that, “ the rule itself has been justly characterized, by the most enlightened tribunals, as, odious and iniquitous.” 16 Ga. R. 294. And again, “it is the duty of Courts, to put the most liberal construction upon these charters, and to struggle hard to get away from the common rule, so far as creditors are to be prejudiced by it.” Id. 330.
Surely, here is exhibited, a degree of aversion to “the common law rule,” so great that it, really, ought to warn us to distrust the decisions, which were adverse to the rule.
Now, is it likely, that many persons would regulate their conduct by such decisions ? I think not. There is no evi *64 dence in this case, that any man ever did buy a single bank note, in consequence of the decisions. For ought that appears, all the notes of the bank were, even before the first decision, in the same hands in which, they now are. Certainly, there is no evidence, that Beall, ihe plaintiff below, did not have his bank notes, when the bank broke, long before the decisions.
If then, the decisions are departed from, as contrary to law, who will have been misled to their loss, and therefore, who will have the right to complain ? There is nothing in the case, to warrant the belief, that a single person will have been.
On the other hand, if the decisions, being contrary to law, are not departed from, the effect will be, to divest all the men, women and children, that ever held stock in the bank of valuable rights which the law gave them, and which were “nominated in their bond;” in a word, will be, to make them sufferers for trusting themselves and their property to the law itself.
/should say, then, that these four decisions ought to be departed from, even, if it were true, (as it is not,) that they are all adverse' to the proposition, that when this charter expired, the liability of the stockholder expired with it; and were it also true, that the other two decisions opposed to these four, are entitled to no weight.
The Act of 1855 — to preserve and dispose of, the property and effects of corporations after their dissolution, and to provide for the payment of the debts due by the same, was slightly referred to, by the counsel for Ihe defendant in error.
But we all think, that there is nothing in that Act, to save the liability of stockholders from extinction. The Act says, that, “the debts due to and by the corporation” — shall not be extinguished. But it no where says, that the debts due from the stockholders, shall not be extinguished. When the charter expires, there is, therefore, nothing in the Act, to keep these debts alive.
*65 And the purpose of the Act, seems only to have been, to preserve the effects of the corporation, and make them, a trust fund for its creditors first, and next, for its stockholders. To such an Act, there could be little constitutional objection by the corporation, itself, as such an Act would be better, perhaps, for the corporation, than “ the common law rule.” But, when it comes to the stockholders, the case is different. By the terms of the charter, as it was when they accepted it, their liability was to expire on the 1st of January, 1857, for the charter itself was to expire on that day. Is it in the power of the Legislature, to prolong this liability indefinitely ? The legislative interference in the Dartmouth College case, was as nothing, to what such a legislative prolonging of this liability, would be.
Hence it was, probably, that the Legislature failed to make the Act extend to the debt, or liability, of stockholders. Indeed, if the language used by the Legislature, were doubtful, here would be reason enough, to require us, to give the benefit of the doubt, to the construction, that would make the language fall short of this debt or liability.
There is yet another reason, quite sufficient, to make me think, that the Act does not apply.
The judgment of forfeiture,in my opinion, totally dissolved the bank. A part of that judgment, was, “ that the liberties, privileges, and franchises, to-wit, those of being a body politic and corporate, be seized into the hands of the State.” If this did not dissolve the bank, what judgment could ?
It is true, that in this particular, the judgment exceeded the directions given in the Act of 1842, but still, the case was one in which, the Court had jurisdiction, and when that is so, a Court’s judgment though erroneous, must stand, until set aside. This is an every-day principle. Indeed, the Court, as I have heard, deliberately disregarded the direction in the Act of 1842, holding such direction unconstitutional— and, of set purpose, made the judgment, one of general and *66 total dissolution. The error, then, if it is an error, I consider to stand on the same footing as the thousands of errors brought to .this Court for correction, which, until reversed bind. See my opinion in Robison vs. Lane, 19 Ga. R. 396.
This judgment, then, as I think, totally dissolved the bank.
This judgment was rendered in 1843, twelve years before the Act of 1855, was passed.
Now, that Act, by its terms, only applies to dissolutions “ from and after the passage of” the Act. The Act therefore, by its terms, does not apply to the dissolution of this bank in 1843.
I said in a previous part of this opinion, that I would here give my reason for thinking, that this Act of 1855, did not save the debts of even the bank itself, from extinguishment. I have now given that reason. The debts were extinguished long before that Act was passed — were extinguished by this judgment of dissolution, rendered in 1843. In that consists my reason.
[7.] Upon the whole, then, the conclusion to which I come, is, that the Court below should, as requested, have told the jury, that, with the expiration of this charter, expired, the liability of the stockholders.*
Judgment reversed.

In answer to the objections made to my presiding in this caso, I refer to my opinion in Lane vs. Morris, 16 Ga. Rep. p. 248.